UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DENNIS EAMES,

                              Plaintiff,

        v.                                                    **DECISION AND ORDER**
                                                              04-CV-894S

JERRY DENNIS, *as President of Local 200*
*United, Service Employees International Union*,
*and in his individual capacity*,

                              Defendant.[1]

## I.  INTRODUCTION

In this action, Plaintiff Dennis Eames alleges that Defendant Jerry Dennis, individually and as President of Local 210 United, violated his rights under the Labor Management Reporting and Disclosure Act[2] ("LMRDA"), 29 U.S.C. § 401, et seq., and defamed him in violation of New York law.  Presently before this Court are the parties' cross-motions for summary judgment.[3]  For the reasons stated below, Defendant's motion is granted as to the federal claims, and this Court declines to exercise supplemental jurisdiction over Plaintiff's state law defamation claims.

---

[1]Plaintiff voluntarily dismissed Andrew L. Stern, President of Service Employees International Union, from this action on November 20, 2005.  (Docket No. 18.)

[2]Also known as the "Landrum-Griffin Act."

[3]Plaintiff filed a Motion for Partial Summary Judgment on his defamation claims.  In support thereof, he filed a memorandum of law, a Rule 56 Statement of Undisputed Facts, the Affidavit of Dennis Eames, with exhibits, the Affidavit of Joseph F. Saeli, Jr., with exhibits and a reply memorandum of law.  In opposition, Defendant filed a Statement of Disputed Material Facts, the Declaration of Mairead E. Connors, Esq., with exhibits, and a memorandum of law.

In support of his summary judgment motion, Defendant filed a memorandum of law, a Rule 56 Statement of Undisputed Facts, with Appendix, the Declaration of Anna Burger, with exhibits, the Affidavit of Michael Lonigro, with exhibits, the Affidavit of Mairead E. Connor, Esq., with exhibits, the Affidavit of Jerry Dennis, with exhibits, the Reply Declaration of Mairead E. Connor, Esq., with exhibits, the Affidavit of Melanie Wlasuk, Esq., with exhibits, and a reply memorandum of law.  In opposition, Plaintiff filed a memorandum of law, a Rule 56 Statement of Disputed Material Facts, with Appendix, the Declaration of Joseph F. Saeli, Jr., Esq., the Declaration of Dennis Eames, and the Affidavit of James Henry.

## II.  BACKGROUND

**A.     Facts**

**1.      Plaintiff's Employment with Local 200 United**

The United Service Employees International Union ("SEIU"), Local 200 ("Local 200 United") and its predecessor unions employed Plaintiff in a variety of capacities between 1976 and 2003.   (Plaintiff's Rule 56 Statement of Undisputed Facts ("Plaintiff's Statement"), ¶ 1; Eames 3/17/06 Aff., ¶ 2; Defendant's Rule 56 Statement of Undisputed Facts ("Defendant's Statement"), ¶ 1.)  He began as director of communications, and over the years held the positions of union representative, organizer, secretary and treasurer. (Eames 3/17/06 Aff., ¶ 2.)   From 2001 through November 6, 2003, Plaintiff held the position of Business Representative or union representative/organizer.  (Eames 3/17/06 Aff., ¶ 3; Defendant's Statement, ¶ 1; Plaintiff's Rule 56 Statement of Disputed Facts ("Plaintiff's Disputed Statement"), ¶ 1.)  Plaintiff was also a member of Local 200 United. (Defendant's Statement, ¶ 2; Plaintiff's Disputed Statement, ¶ 2.)

Defendant is and has been the President of Local 200 United since 2001. (Defendant's Statement, ¶ 6.)  Deana Fox was the Executive Vice President of Local 200 United.  (Defendant's Statement, ¶ 7.)  She worked in the Buffalo office with Plaintiff and Matthew Burke.  (Defendant's Statement, ¶ 7; Plaintiff's Disputed Statement, ¶ 7.)  Like Plaintiff, Fox and Burke were members of Local 200 United.  (Defendant's Statement, ¶ 8.)

**2.      The Shotgun Shell Incident**

Defendant had the authority to review employees' performances and hire and fire

employees on the Local 200 United staff.  (Defendant's Statement, ¶ 10.)  During one of

his visits to the Buffalo office in June of 2003, Defendant discovered a live 12-gauge

shotgun shell on the windowsill in Burke's office.  (Defendant's Statement, ¶ 11.)  Written

on the shell were the names "Jerry" and "Chris," referring to Defendant and Chris Binaxas,

who was then the Director of Organizing.  (Defendant's Statement, ¶ 11.)  The shotgun

shell had been on Burke's windowsill for between nine and twelve months.  (Defendant's

Statement, ¶ 12.)

Defendant asked Plaintiff about the shotgun shell, but Plaintiff would not discuss it.

(Defendant's Statement, ¶ 14; Plaintiff's Disputed Statement, ¶ 14.)  A few days later,

however, Plaintiff told Defendant over the telephone that he had written the names on the

shell and given it to Burke.  (Defendant's Statement, ¶¶ 13, 16.)  Plaintiff told Defendant

that he had given the shell to Burke as a joke after Burke was criticized by a staff member

at a building service meeting in Syracuse, N.Y., about his handling of the janitorial contract.

(Defendant's Statement, ¶ 17; Plaintiff's Disputed Statement, ¶ 17.)   Fox, however,

indicated that Plaintiff gave Burke the shotgun shell with the names on it to build

camaraderie.  (Defendant's Statement, ¶ 21.)

Defendant maintains that Local 200 United suspended Burke's employment on June

27, 2003, because he kept the shotgun shell on his windowsill and for poor work

performance.  (Defendant's Statement, ¶ 20.)  However, at his deposition, Burke testified

that Defendant suspended him because he thought that Burke, Fox and Eames made him

uncomfortable and were perhaps out to get him.  (Plaintiff's Disputed Statement, ¶ 20.)

Defendant asserts that less than one month later, Local 200 United terminated Burke's

employment for keeping the shotgun shell, for poor work performance, and for threatening

to punch Binaxas during a meeting.  (Defendant's Statement, ¶ 22.)  However, Plaintiff maintains that Burke was terminated for poor work performance, not for his possession of the shotgun shell.  (Plaintiff's Disputed Statement, ¶ 22.)  Burke resigned his union membership on November 1, 2003.  (Defendant's Statement, ¶ 25; Dennis Amend. Aff., Exhibit 4.)

### 3. Local 200 United's Investigation

On July 28, 2003, Defendant appointed an Investigatory Committee to investigate allegations of misconduct in the Buffalo office, including the shotgun shell incident. (Defendant's Statement, ¶ 26; Lonigro Aff., ¶¶ 2, 3.)  The Committee consisted of Michael Lonigro (Vice-President of Local 200 United), Dan Verstreate (Executive Board member) and Leo Williams, Sr. (Executive Board member).  (Defendant's Statement, ¶ 26; Plaintiff's Disputed Statement, ¶ 26.)  Local 200 United in-house counsel Melanie Wlasuk, Esq., served as the Committee's legal advisor.  (Defendant's Statement, ¶ 26; Plaintiff's Disputed Statement, ¶ 27; Wlasuk Aff., ¶ 2.)  Defendant delegated his authority to evaluate, discipline, or discharge Plaintiff to the Committee and the Executive Board.  (Defendant's Statement, ¶ 27; Plaintiff's Disputed Statement, ¶¶ 28, 29; Lonigro Aff., ¶ 3.)  The Committee was tasked with presenting a report and recommendation to the Executive Board concerning whether it should prefer Plaintiff and Fox to the International Union to face charges for conduct unbecoming a member.  (Defendant's Statement, ¶ 29.)

On or about July 30, 2003, Plaintiff received a copy of a memorandum Defendant had written to Fox detailing the allegations that Defendant had made to the Investigatory Committee.  (Defendant's Statement, ¶ 30; Plaintiff's Disputed Statement, ¶ 30; Lonigro

Aff., Exhibit 1.)  The Investigatory Committee took written statements and interviewed several officers and staff of Local 200 United.  (Defendant's Statement, ¶ 31; Lonigro Aff., ¶ 5.)

In a meeting with Plaintiff and Fox on September 24, 2003, the Committee discussed whether the matter could be settled.  (Defendant's Statement, ¶ 32; Lonigro Aff., ¶ 6.)  When settlement could not be accomplished, Plaintiff declined to sit for an interview with the Committee and instead left the room.  (Defendant's Statement, ¶ 32; Lonigro Aff., ¶ 6.)  Thereafter, the Investigatory Committee unanimously determined that Plaintiff had written Defendant and Binaxas' names on the shotgun shell, and concluded that this conduct was improper and insubordinate.[4]  (Defendant's Statement, ¶ 33; Lonigro Aff., ¶ 7.)  It further resolved to recommend to the Executive Board that Plaintiff and Fox's employment with the union be terminated, and that they be preferred to the International Union to face charges for conduct unbecoming a member.  (Defendant's Statement, ¶ 34; Plaintiff's Disputed Statement, ¶ 34; Lonigro Aff., ¶ 7 and Exhibit 1.)  The Committee included these findings in its written report to the Executive Board.  (Defendant's Statement, ¶ 33; Lonigro Aff., Exhibit 1.)

### 4.      The Memorandum of Agreement

On or about October 9, 2003, Plaintiff and Local 200 United entered a Memorandum of Agreement to resolve Plaintiff's disciplinary issues.  (Eames Aff., ¶ 4; Defendant's Statement, ¶ 35; Defendant's Appendix, Exhibit 13.) Therein, Plaintiff agreed to a 1-year suspension of his union membership, and a 1-year term of probation with

---

[4]Plaintiff had already admitted to Defendant and the Committee that he had written the names on the shotgun shell.  (Plaintiff's Disputed Statement, ¶ 33; Lonigro Aff., ¶ 7.)

respect to his employment with the union.  (Eames Aff., ¶ 4; Defendant's Statement, ¶ 35; Defendant's Appendix, Exhibit B.)   Local 200 United agreed to retroactively restore Plaintiff's membership and all attendant membership rights upon Plaintiff's payment of back dues for his year of suspension.   (Defendant's Statement, ¶ 35; Defendant's Appendix, Exhibit 13.)   Plaintiff, however, never paid his back dues.   (Defendant's Statement, ¶ 44.)  In addition, Local 200 United agreed to halt processing charges against Plaintiff.   (Defendant's Statement, ¶ 35; Defendant's Appendix, Exhibit 13.)   The Memorandum of Agreement also contained a general release provision.  (Defendant's Appendix, Exhibit 13.)

### 5.      Plaintiff's Emails

On October 20, 2003, while on probation, Plaintiff sent an email to Local 200 United's former attorney, Michael J. Duffy.   (Defendant's Statement, ¶ 46; Plaintiff's Statement, ¶ 46.)   Therein, he advised Duffy that he and Fox had agreed to sever their relationships with the union and he stated that "if there is any peace at hand it will be the peace everlasting I hope to give to those who have wiped out my family."  (Defendant's Statement, ¶ 46.)   Also, on November 4, 2003, Plaintiff sent an email to Fox at her personal email account, which referred to female co-worker Corinne Zajac as a "fucking cunt" and a "fat ass."  (Defendant's Statement, ¶ 45; Plaintiff's Statement, ¶ 45.)

Zajac allegedly discovered the emails on a computer at Local 200 United's Buffalo office and provided copies to Defendant.  (Defendant's Statement, ¶ 47.)   Defendant maintains that upon reviewing the emails, he concluded that Plaintiff had (1) violated his employment probation, (2) committed serious misconduct and insubordination by insulting

Zajac and communicating with Duffy, and (3) had threatened him with the "peace everlasting" comment.  (Defendant's Statement, ¶ 49; Dennis Amend. Aff., ¶ 9.)  In addition, Defendant concluded that Plaintiff, through his actions, was creating a hostile work environment and had no intention of working with Zajac to serve the union members. (Defendant's Statement, ¶ 49.)  Consequently, Local 200 United terminated Plaintiff's employment by letter dated November 6, 2003, effective November 7, 2003, which Wlasuk later determined to be supported by "just cause" under the terms of the Memorandum Agreement. (Defendant's Statement, ¶¶ 48, 50; Plaintiff's Disputed Statement, ¶ 48; Wlasuk Aff., ¶¶ 14, 15 and Exhibit D.)  Plaintiff contests this statement as the reasons for his dismissal.  Rather, he maintains that Defendant wanted to remove him from the union so that he would not threaten Defendant's chances of retaining the presidency of Local 200 United in the 2004 election.  (Plaintiff's Disputed Statement, ¶ 49.)

### 6.    Defendant's Letter to the Union Members

By letter dated November 7, 2003, Defendant informed the 1,200 union members that Local 200 United terminated Plaintiff's employment with the union as of November 7, 2003.  (Plaintiff's Statement, ¶ 3; Eames 3/17/06 Aff., ¶¶ 2, 6 and Exhibit A; Defendant's Statement, ¶ 51.)  Defendant explained in the letter the reasons for Plaintiff's termination and announced that Mike Jablanski, Jr., would assume Plaintiff's position.  (Eames 3/17/06 Aff., Exhibit A.)  The first paragraph of the letter states as follows:

> Over the past few months, a special committee of your SEIU, Local 200 United Executive Board investigated Business Representative Dennis Eames for serious acts of gross misconduct and insubordination.  This independent committee concluded that Eames was, in fact, guilty of all charges.  In an effort to correct this behavior, and to avoid jeopardizing service

to our members, Eames agreed to continue employment on a
probationary status.

(Eames 3/17/06 Aff., Exhibit A.)

It is undisputed that no formal charges were preferred or otherwise brought against

Plaintiff under the SEIU International Constitution and Bylaws.  (Plaintiff's Statement, ¶¶

4, 5; Defendant's Rule 56 Statement of Disputed Material Facts, ¶ 4.)  As such, Plaintiff

argues that the first paragraph of Defendant's letter is defamatory.

## B.      Procedural History

Plaintiff instituted this action on November 5, 2004, by filing a Complaint in the

United States District Court for the Western District of New York.  Defendant filed an

Answer on January 7, 2005.  On March 20, 2006, Plaintiff filed a Motion for Partial

Summary Judgment on its defamation claims.  Defendant filed a Cross-Motion for

Summary Judgment on July 7, 2006.  After full briefing, this Court heard oral argument on

October 31, 2006, after which it reserved decision.

## III.  DISCUSSION AND ANALYSIS

## A.      Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted

where the "pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return

a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,

106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the

outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn

from the evidence must be "viewed in the light most favorable to the party opposing the

motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26

L.Ed.2d 142 (1970).  "Only when reasonable minds could not differ as to the import of

evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.

1991).  The function of the court is not "to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S.

at 249.

## B.      Effect of the Memorandum of Agreement

Defendant argues that the majority of Plaintiff's LMRDA claims must be dismissed

because they are barred by the terms of the Memorandum of Agreement that Plaintiff

entered on October 9, 2003.  The parties entered the Memorandum of Agreement to avoid

the costs of future litigation.  (Defendant's Appendix, Exhibit 13.)  The release portion of

the Agreement provides as follows:

> Mr. Eames agrees to release the Union, its officers, agents
> and employees, and their successors and assigns, and the
> International, its officers, agents and employees, and their
> successors and assigns, from all actions proceedings, debts,
> contracts, damages, and claims whatsoever, in law or equity,
> which against them he ever had or now has as of the date of
> this agreement.  These include, but are not limited to, claims
> for nonpayment of wages, breach of contract, discrimination on
> the basis of sex, age, race, religion, national origin and/or
> marital status, whether arising under the Taylor Law, Title VII
> of the Civil Rights [sic] of 1964, the New York State Human
> Rights Law, or any other law; claims for attorneys' fees; and
> any other claims whatsoever, whether based upon
> constitutional, statutory or common law, whether federal, state

or local.

(Defendant's Appendix, Exhibit 13.)

Plaintiff does not dispute the terms of this release.  Instead, he argues that the

Memorandum of Agreement is voidable based on fraud in the inducement of fraud *in*

*factum*.  In particular, he argues that Defendant engaged in fraud when he agreed in the

Memorandum of Agreement to "halt processing the current charges of misconduct against

Mr. Eames in both the forum of the Local's Executive Board, and the International's

Executive Board" because no such "charges" existed.  (Defendant's Appendix, Exhibit 13.)

Defendant counters that Plaintiff failed to plead fraud with specificity under Rule 9(b), to

which Plaintiff responds that such heightened pleading is not required for an argument

raised in opposition to summary judgment.   This Court finds Plaintiff's argument

unpersuasive.

Nowhere in his Complaint does Plaintiff allege that he was fraudulently induced into

entering the Memorandum of Agreement.  In ¶ 19 of the Complaint, Plaintiff alleges that

he and Defendant entered the Memorandum of Agreement, and he sets forth several

provisions thereof.  He does not, however, allege or suggest that Defendant fraudulently

induced him into signing the Memorandum of Agreement, nor does he assert fraud as a

cause of action.  Given the clear release provision in the Memorandum of Agreement, this

Court finds that it is part and parcel of Plaintiff's LMRDA claims that pre-date it. That is,

Plaintiff should reasonably have known that his path to securing relief would require that

he overcome the release provision as part of his LMRDA claims, and he should therefore

have pled fraud with particularity[5] as a cause of action or in conjunction with the relevant

LMRDA claims.  See Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (the "principle

function of pleadings under the Federal Rules is to give the adverse party fair notice of the

claim asserted so as to enable him to answer and prepare for trial"). In this Court's view,

his failure to do so is in contravention of Rules 8 and 9.  See FED. R. CIV. P. 8(a)(2)

(requiring a "short and plain statement of the claim showing that the pleader is entitled to

relief"); FED. R. CIV. P. 9(b) (requiring that averments of fraud be pled with particularity).

In any event, Plaintiff has not come forward with any evidence that he was

fraudulently induced into entering the Memorandum of Agreement.  Plaintiff had the

opportunity to be represented by counsel, and the terms of the Agreement itself aver that

the parties' consent "was not induced by fraud, duress or any other undue influence."

(Defendant's Appendix, Exhibit 13.)

Moreover, Plaintiff's argument that Defendant committed fraud because there were

no charges pending before the Local or International Union at the time the Agreement was

executed is also unavailing.  The Memorandum of Agreement does not reference formal

pending charges.  Rather, it states that "[t]he Union agrees that, upon the execution of this

agreement, it will *halt processing the current charges of misconduct against Mr. Eames*."

(Defendant's Appendix, Exhibit 13 (emphasis added).)  It is undisputed that at the time the

parties entered the Memorandum of Agreement, Plaintiff was the subject of allegations or

---

[5]"Particularity requires that the complaint: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Volunteer Firemen's Ins. Serv., Inc. v. McNeil & Co., 221 F.R.D. 388, 391 (W.D.N.Y. 2004) (quoting Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999)).

charges of misconduct (those investigated by the Investigatory Committee), though not formal preferred charges.

That the parties understood or were on notice that official or preferred charges were not then pending is evidenced by the next sentence in the Agreement, which states that "[t]his shall not preclude, however, the Union *filing charges* against Mr. Eames for any future acts of misconduct." (Defendant's Appendix, Exhibit 13 (emphasis added).) Thus, the parties recognized in the Memorandum of Agreement the distinction between *processing* charges and *filing* charges. And again, it is undisputed that the parties entered the Memorandum of Agreement, at least in part, to resolve the charges of misconduct that the Investigatory Committee had been investigating and to avoid litigation relating thereto.

As such, in addition to the pleading deficiencies under Rules 8 and 9 that form an independent basis for rejecting Plaintiff's fraud claims, this Court further finds that there is no genuine issue of material fact, and that charges were in fact being processed against Plaintiff as referenced in the Memorandum of Agreement. Consequently, any claims arising out of conduct occurring on or before October 9, 2003, are barred by the bargained-for release provision in the Memorandum of Agreement, essentially leaving only Plaintiff's claims relating to his termination.

**B.    Plaintiff's LMRDA Claims**

Congress enacted the LMRDA as a supplement to the Labor Management Relations Act, 29 U.S.C. § 141, et seq., and the Railway Labor Act, 45 U.S.C. § 151, et seq. See 42 U.S.C. § 401(c). In doing so, it sought to eliminate "improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and

representatives" that burden or obstruct commerce.  Id.  Congress also intended to protect

"the rights and interests of employees and the public generally as they relate to the

activities of labor organizations, employers, labor relations consultants, and their officers

and representatives."  42 U.S.C. § 401(b).  It further sought to "encourage democratic self-

governance in unions and to curb widespread abuses and corruption among union

leadership."  Maddalone v. Local 17, United Bhd. of Carpenters & Joiners of Am., 152 F.3d

178, 183 (2d Cir. 1998) (citations omitted).  Plaintiff maintains that Defendant terminated

his employment in violation of 29 U.S.C. §§  411(a)(2), (a)(5) and 529.

The LMRDA protects a member's freedom of speech and assembly, and it guards

members against improper disciplinary action, as follows:

> (2)  Every *member* of any labor organization shall have the
> right to meet and assemble freely with other members; and to
> express any views, arguments, or opinions; and to express at
> meetings of the labor organization his views, upon candidates
> in an election of the labor organization or upon any business
> properly before the meeting, subject to the organization's
> established and reasonable rules pertaining to the conduct of
> meetings: *Provided*, That nothing herein shall be construed to
> impair the right of a labor organization to adopt and enforce
> reasonable rules as to the responsibility of every member
> toward the organization as an institution and to his refraining
> from conduct that would interfere with its performance of its
> legal or contractual obligations.
>
> . . .
>
> (5)  No *member* of any labor organization may be fined,
> suspended, expelled, or otherwise disciplined except for
> nonpayment of dues by such organization or by any officer
> thereof unless such member has been (A) served with written
> specific charges; (B) given a reasonable time to prepare his
> defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(2) and (5) (emphasis added).

Moreover, the LMRDA provides that

> [i]t shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its *members* for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

29 U.S.C. § 529 (emphasis added).

As used in the above statutory provisions, a "member" or "member in good standing" of a labor organization is defined in the LMRDA as including "any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership *nor has been* expelled or *suspended from membership* after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization." 42 U.S.C. § 402 (o) (emphasis added).

This Court finds that Plaintiff's remaining LMRDA claims related to his termination must be dismissed for two reasons. First, it is undisputed that under the terms of the Memorandum of Agreement, Plaintiff's membership in Local 200 United was suspended for a period of one year. (Defendant's Appendix, Exhibit 13.) In addition, because Plaintiff was not paying union dues during his suspension, he was not a member in good standing at the time of his termination. Cf. Agola v. Hagner, 678 F.Supp. 988, 992-94 (E.D.N.Y. 1987) (plaintiff who did not pay dues never became members of union and were therefore precluded from obtaining relief under the LMRDA). Article 3.5 of Local 200 United's Constitution and Bylaws requires that an individual be current in his or her dues payments

to be considered a member in good standing.[6]  See Dennis Amend. Aff., Exhibit 2; see also

Hughes v. Bricklayers & Allied Craftworkers, Local 45, 386 F.3d 101, 106 (2d Cir. 2004)

(requiring deference to a union's construction of its own constitution and rules unless

patently unreasonable) (citing cases).

        For these two reasons, Plaintiff was not a member of the union at the time of his

termination, or at any point after October 9, 2003.  Therefore, he cannot state a claim

under the LMRDA and his claims must be dismissed.  See Finnegan v. Leu, 456 U.S. 431,

435-37, 102 S.Ct. 1867, 1870-71, 72 L.Ed.2d 239 (1982) (discussing the fact that the

LMRDA protects union members); Phelan v. United Ass'n of Journeymen & Apprentices

of the Plumbing & Pipefitting Indus. of the United States & Canada, Local 305, 973 F.2d

1050, 1055-57(2d Cir. 1992) (holding that there is no subject matter jurisdiction under the

LMRDA where plaintiffs are not members of the union); Wall v. Constr. & Gen. Laborers'

Union, Local 230, No. 3:97-CV-942, 2006 WL 197353, at *1 (D. Conn. Jan. 24, 2006) ("The

LMRDA only provides a cause of action to union members, which includes anyone who

has 'fulfilled the requirements of membership.'") (quoting Phelan, 973 F.2d at 1057); Farrell

v. Hellen, 367 F.Supp.2d 491, 499 (S.D.N.Y. 2005) ("The LMRDA creates a cause of action

for a *union member* whose rights have allegedly been violated." (emphasis added));

Brodsky v. United Local 306, No. 98 CIV. 2325, 1999 WL 102763, at *6 (S.D.N.Y. Feb. 24,

---

[6]Article 3.5 provides that "A member of the Union shall pay dues and/or fees owing to the Union as set forth in this Constitution and By-laws in order to be considered current in his/her financial obligations and in good standing.  No person shall be entitled to the rights and privileges of Union membership unless he/she is current in his/her financial obligations to SEIU 200 United."  (Dennis Amend. Aff., Exhibit 2.)  The requirement that dues be current in order to sustain membership is also reflected in Article 3.3, which requires new members to pay the first dues payment required under the dues schedule before they are considered a member.  (Dennis Amend. Aff., Exhibit 2.)  It is undisputed that Plaintiff did not pay dues during his suspension, or at any time thereafter.

1999) ("the LMRDA only protects the rights of members").

Second, dismissal is appropriate because the LMRDA does not protect union employment.  "It is readily apparent, both from the language of [29 U.S.C. §§ 411(a)(1) and (2)] and from the legislative history of Title I, that it was rank-and-file union members – not officers or employees, as such – whom Congress sought to protect.  Finnegan, 456 U.S. at 437 (holding that LMRDA protects union members, not employees); Phelan, 973 F.2d at 1056 ("we have held that we have subject matter jurisdiction to hear only those suits brought by plaintiffs against unions rather than employers"); Cotter v. Owens, 753 F.2d 223, 226 (2d Cir. 1985) ("The LMRDA protects union members as members, not in their roles as union officers or employees").  Here, Plaintiff's termination involved only his employment with the union, not his membership in the union.  (See Wlasuk Aff., Exhibit D ("The following is to inform you that as of November 7, 2003, your employment with [Local 200 United] is terminated for serious misconduct and gross insubordinate behavior.").

Accordingly, this Court finds that the balance of Plaintiff's claims seeking relief under the LMRDA based on Defendant's termination of his employment with the union must be dismissed for failure to state a claim.

## C.    State Law Causes of Action

Having disposed of all federal claims, this Court will decline to exercise supplemental jurisdiction over Plaintiff's state law defamation claims.  See 28 U.S.C. § 1367(c)(3).  The United States Supreme Court has instructed that courts should ordinarily decline to exercise supplemental jurisdiction in the absence of federal claims.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720

(1988) (noting that in the usual case where all federal claims are eliminated before trial, the relevant factors informing the decision of whether to exercise supplemental jurisdiction will "point towards declining to exercise jurisdiction over the remaining state-law claims"); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

The Second Circuit shares this view: where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003); see also Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well."); Powell v. Gardner, 891 F.2d 1039, 1047 (2d Cir. 1989) ("in light of proper dismissal of the § 1983 claim against the County, the district court should have declined to exercise pendent jurisdiction over Powell's state-law claims against the County").

Accordingly, in the absence of any federal claims or issues implicating federal policies, this Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and will instead dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## IV.  CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment is granted as to the federal claims.  Plaintiff's Motion for Partial Summary Judgment is denied

as moot.  Further, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and they will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## V.  ORDERS

IT HEREBY IS ORDERED, that Plaintiff's Motion for Partial Summary Judgment (Docket No. 23) is DENIED as moot.

FURTHER, that Defendant's Cross-Motion for Summary Judgment (Docket No. 41) is GRANTED as to the federal claims.

FURTHER, that this Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which are hereby DISMISSED pursuant to 28 U.S.C. § 1367(c)(3) without prejudice.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.


Dated:   March 30, 2007
         Buffalo, New York

                                              /s/William M. Skretny
                                             WILLIAM M. SKRETNY
                                             United States District Judge

18